William C. STEELE, et al., Plaintiffs,

v.

**DEPUY ORTHOPAEDICS, INC., Defendant.**

**No. CIV. 02–3783(RBK).**

United States District Court, D. New Jersey.

Dec. 11, 2003.

Christopher D. Mannix, Esq., Sidkoff, Pincus & Green, P.C., Philadelphia, PA, for Plaintiffs.

George E. McDavid, Esq., Reed Smith Shaw & McClay, LLP, Princeton, NJ, Steven T. Voigt, Esq., Reed Smith, LLP, Philadelphia, PA, for Defendant.

## AMENDED OPINION

KUGLER, District Judge.

In this product liability case, Plaintiffs William C. Steele and his wife Linda G. Steele filed suit, individually and on behalf of a class of similarly situated persons, against Defendant DePuy Orthopaedics, Inc., the manufacturer of an artificial knee joint prosthesis known as the "LCS–P/S Total Knee System" ("LCS–P/S Knee"). Plaintiffs assert state-law claims of negligent design, manufacturing, warnings, and labeling, as well as strict liability, breach of express and implied warranty, and fraudulent concealment by DePuy regarding the safety and efficacy of the LCS–P/S Knee.

DePuy moves for summary judgment, arguing that Plaintiffs' state-law claims are preempted by the 1976 Medical Device Amendments ("MDA") to the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 360 *et seq.*, specifically, 21 U.S.C. § 360k(a), because the LCS–P/S Knee received premarket approval ("PMA") by the United States Food and Drug Administration ("FDA"). DePuy also moves to strike, or in the alternative requests that the Court disregard, the affidavits of Dr. Charles H. Kyper pursuant to Fed.R.Evid. 702 and Fed.R.Civ.P. 56(e).

For the reasons expressed below, DePuy's motion for summary judgment is (1)

granted with respect to Plaintiffs' state-law claims of negligent manufacturing, design, warning and labeling, strict product liability, and breach of implied warranty of merchantability and fitness for a particular purpose, and (2) denied with respect to Plaintiffs' state-law claims of breach of express warranty and fraudulent concealment. The Court also grants DePuy's motion to strike Dr. Charles H. Kyper's affidavits.

## I. *FACTUAL BACKGROUND*

### A. *The Parties*

Plaintiff William C. Steele ("Steele") suffers from degenerative osteoarthritis in his knees. To alleviate the pain and discomfort associated with that disease and to increase Steele's mobility, doctors implanted the LCS–P/S Knee[1] in his knees. Defendant DePuy Orthopaedics, Inc. ("DePuy") designs, manufactures, distributes, and markets the LCS–P/S Knee, and its predecessor, the LCS–Knee.

Following his operation, Steele began to suffer "acute pain and swelling" and "hemarthrosis," or a "hemorrhage in a joint," in his knees. He alleges that his orthopedic surgeon, Dr. Stephen J. Zabinski, spoke with a sales representative of DePuy regarding Steele's post-operative complications. Steele claims that in response to those complaints, DePuy's sales representative "admitted" that the LCS–P/S Knee

contained a design defect and had been withdrawn from the market for that reason.

Steele underwent surgery for the removal of the "tibial insert component" of the LCS–P/S Knee in his right knee. He maintains that he continues to suffer "pain, swelling, hemarthrosis and loss of mobility in his right knee," and likely will undergo surgery to extract the remainder of the LCS–P/S Knee in the right knee. As noted, Steele brought this class action against DePuy asserting state-law claims of negligence, strict product liability, breach of express and implied warranty, and fraudulent concealment regarding the safety and effectiveness of the LCS–P/S Knee's "tibial insert components." The class consists of "all citizens and residents of the United States who have had one or more LCS–P/S Knees surgically implanted in their bodies, together with their spouses." To date, the class has not been certified.

### B. *The MDA and the PMA process*

In 1976, Congress enacted the Medical Device Amendments of the FDCA in response to public concern about the safety and effectiveness of medical devices. The MDA grants the FDA broad authority to regulate medical devices and establishes a regulatory framework that classifies medical devices intended for human use into three categories or classes "based on the risk that they pose to the public." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476, 116

---

**1.** The LCS–P/S Knee prosthesis consists of three basic components: femoral, tibial, and patellar. The femoral component is placed on the distal (farthest) end of the femur where it comprises the "top of the knee joint." The tibial component is placed on the proximal (nearest) end of the tibia and comprises the "bottom" of the knee joint. The tibial component consists of a metal tray and a rotating bearing insert, made of ultra high molecular weight polyethylene. The bearing insert has a cone-shaped base that sits in a corresponding depression in the metal tibial tray, permitting

the insert to more closely duplicate the biomechanics of a human knee. A raised central tibial spine on the bearing insert engages a cam surface on the femoral component to provide posterior stability. The metal femoral component actually articulates with this bearing. The patellar component consists of a polyethylene piece joined to a metal piece designed to replace the articulating surface of the anatomical patella or kneecap. This patellar component articulates with the femoral component.

S.Ct. 2240, 135 L.Ed.2d 700 (1996). Class I devices are those devices that present no unreasonable risk of illness or injury and are subject only to minimal regulation by "general controls." 21 U.S.C. § 360c(a)(1)(A). Class II devices, which present a greater risk of harm than Class I devices, may be marketed without advance FDA approval but require manufacturers to comply with federal performance regulations known as "special controls." 21 U.S.C. § 360c(a)(1)(B). Class III devices are devices that either (1) "present[ ] a potential unreasonable risk of illness or injury," or are (2) "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health[.]" 21 U.S.C. § 360c(a)(1)(C)(ii)(I-II). The parties do not dispute that the LCS–P/S Knee, and its predecessor, the LCS–Knee, are Class III devices under the FDCA.

Before a Class III device can be marketed to the public, the manufacturer must provide the FDA with "reasonable assurance" that a device is both safe and effective. 21 U.S.C. § 360c(a)(1)(C)(i). The manufacturer may furnish those assurances through the FDA's premarket approval process. 21 U.S.C. § 360e(a). The rigorous and exhaustive PMA process requires manufacturers to "submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending ·an average of 1,200 hours on each submission." *Lohr*, 518 U.S. at 477, 116 S.Ct. 2240.[2] *See* 21 U.S.C. § 360e(c)(1)(A)-(G); 21 C.F.R. § 814.20. Typically, the FDA refers the device to an independent panel of experts, which prepares a report and recommendation on whether to approve the device. *See* 21 U.S.C. § 360e(d)(2). If the FDA determines that the manufacturer has provided reasonable assurances that the device is safe and effective for its intended use, then the agency issues an order that permits the manufacturer to market the device as approved. It does so after a manufacturer demonstrates that the manufacturing and processing methods and facilities conform to FDA requirements, and that the proposed labeling of the device is not false or misleading. 21 U.S.C. § 360e(d)(2). Thereafter, the manufacturer may not al-

---

**2.** A PMA application must contain the following information:

(A) full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective;

(B) a full statement of the components, ingredients, and properties and of the principle or principles of operation, of such device;

(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device;

(D) an identifying reference to any performance standard under section 360d of · this title which would be applicable to any aspect of such device if it were a class II device, and either adequate information to show that such aspect of such device fully meets such performance standard or adequate information to justify any deviation from such standard;

(E) such samples of such device and of components thereof as the Secretary may reasonably require, except that where the submission of such samples is impracticable or unduly burdensome, the requirement of this subparagraph may be met by the submission of complete information concerning the location of one or more such devices readily available for examination and testing;

(F) specimens of the labeling proposed to be used for such device; and

(G) such other information relevant to the subject matter of the application as the Secretary, with the concurrence of the appropriate panel under section 360c of this title, may require.

21 U.S.C. § 360e(c)(1)(A)-(G).

ter the approved labeling, product design, or manufacturing process in any way that would affect the safety or effectiveness of the device. 21 C.F.R. § 814.80.

If a manufacturer intends to modify a Class III device and that modification affects the safety and effectiveness of the device, the manufacturer must submit a PMA supplement for FDA approval.[3] 21 C.F.R. § 814.39; *see also* 21 C.F.R. § 814.37 (permitting manufacturer to submit amendments to PMA or PMA supplement before approval). According to FDA regulations, changes that may affect the safety and effectiveness of the device include but are not limited to (1) new indications for use of the device, (2) labeling changes, (3) the use of a different facility or establishment to manufacture, process, or package the device, (4) changes in sterilization procedures, (5) changes in packaging, and (6) changes in the performance or design specifications, circuits, components, ingredients, principle of operation, or physical layout of the device. 21 C.F.R. § 814.39.

Three exceptions exist to allow a manufacturer to market a medical device without premarket approval. First, Congress incorporated a "grandfathering" provision in the MDA that allows pre–1976 devices to remain on the market without FDA approval until such time as the FDA initiates and completes the requisite PMA for the device. *See* 21 U.S.C. § 360e(b)(1)(A); 21 C.F.R. § 814.1(c)(1). Second, an investigational device exemption ("IDE") permits manufacturers to market "a device that otherwise would be required to comply with a performance standard or to have premarket approval to be shipped lawfully for the purpose of conducting investigations of that device." 21 C.F.R.

§ 812.1. An IDE allows a manufacturer to use a device in clinical studies in order to collect information regarding the safety and effectiveness of the device. *See* 21 U.S.C. § 360j(g)(1).

Finally, "to prevent manufacturers of grandfathered devices from monopolizing the market while new devices clear the PMA hurdle, and to ensure that improvements to existing devices can be rapidly introduced into the market, the Act … permits devices that are 'substantially equivalent' to pre-existing devices to avoid the PMA process." *Lohr*, 518 U.S. at 478, 116 S.Ct. 2240 (citing 21 U.S.C. § 360e(b)(1)(B)). "Although 'substantially equivalent' Class III devices may be marketed without the rigorous PMA review, such new devices, as well as all new Class I and Class II devices, are subject to the requirements of § 360k." *Id.* Section 360k "imposes a limited form of review on every manufacturer intending to market a new device by requiring it to submit a 'premarket notification' to the FDA (the process is also known as a ' § 510(k) process,' after the number of the section in the original Act)." *Id.* As noted by the Supreme Court, "[t]he § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." *Id.* at 478–79, 116 S.Ct. 2240.

### C. PMA review of the LCS–Knee and PMA supplement review of the LCS–P/S Knee

#### 1. PMA review of the LCS–Knee

In 1980, DePuy began the multi-year approval process for the LCS–Knee by filing an IDE application with the FDA.

---

**3.** Different types of PMA supplements exist depending on the type of change made to the PMA-approved device. *See, e.g.,* 21 C.F.R. §§ 814.39(a)(180–day PMA supplement); 814.39(d)(special PMA supplement); 814.39(f)(30–day notice and 135–day PMA supplement); 814.39(e) (annual report or 30–day PMA supplement).

That application included all relevant publications and research studies concerning the proposed device and its materials and design, a detailed proposal for the method and manner of conducting clinical studies including the methods and materials to be used for informed patient consent, and a description of the proposed product and its manufacturing processes and controls. After the FDA accepted DePuy's IDE application, certified orthopaedic surgeons conducted clinical studies on the LCS–Knee. Those studies, which were monitored by FDA-certified investigators, involved surgical implantation of the knee prosthesis on patients.

DePuy filed a PMA application for the LCS–Knee in 1983. That application consisted of more than 2,000 pages, and included the design, manufacturing, and quality control procedures for the device, as well as an analysis of the data from the clinical studies involving the device. As part of the application process, the FDA required mechanical testing of the device by an independent third-party. In 1984, the FDA's independent advisory panel recommended approval of the LCS–Knee, and following further investigations and a review of the labeling of the device, the FDA approved the LCS–Knee for commercial distribution. It subsequently published a summary of the safety and effectiveness of the LCS–Knee in the Federal Register.

### 2. PMA supplement review of the LCS–P/S Knee

In response to "interest from the orthopedic surgical community for a posterior-stabilized knee with design features of the LCS product line," DePuy began the design work on the LCS–P/S (posterior stabilized) Knee in 1997. One year later, DePuy filed a PMA supplement application for the LCS–Knee, requesting approval for the addition of "posterior stabilized femoral and tibial bearing components and rotating platform (RP II) tibial trays and bearing components to the LCS Total Knee System." According to DePuy, the PMA supplement for the "posterior-stabilized components" contained the design rationale for the added components, fully dimensioned engineering drawings and photographs of all of the components, manufacturing process specifications, materials specifications, and sterilization and packaging specifications. The application also contained changes in the surgical technique necessitated by the components, along with draft labeling in the form of a package insert, representative copies of the packaging specifications and copies of the outer package labels.

The FDA evaluated DePuy's PMA supplement through a program known as "Real–Time" review.[4] Shortly thereafter, the FDA approved DePuy's PMA supplement.[5] That approval was subject to the FDA's "Conditions of Approval," as well as other general labeling and marketing restrictions set forth in 21 C.F.R. § 801.109. The FDA's document entitled "Conditions of Approval" required DePuy to submit the LCS–P/S Knee's proposed labeling before marketing, to limit advertising to the approved labeling, to submit a PMA sup-

4. The FDA implemented a pilot of the Real–Time program for PMA supplement in 1996. See http://www.fda.gov/cdrh/ode/realtim2.html. Based on the success of that program, which included faster review times for manufacturers and efficient use of FDA staff time, the FDA extended the Real Time program to all PMA holders seeking to file a PMA supplement. Id.

5. According to Cheryl H. Hastings, DePuy's Director of Regulatory Affairs, "[t]he PMA supplement for the LCS–P/S Knee was DePuy's 57th supplement to" the original PMA for the LCS–Knee. Hastings also indicates that since 1996 the FDA has granted DePuy's request for Real–Time review of 19 PMA Supplements to the LCS–Knee.

plement for review and approval before making any modifications affecting the safety or effectiveness of the device, to submit post-approval reports, and to report any incidents of adverse reaction to, or known defect of, the approved device. Pursuant to the FDA's request, DePuy subsequently submitted an amendment to the PMA supplement that included FDA-approved labeling for the LCS–P/S Knee.

In 2000, the FDA issued an "Enforcement Report" indicating that DePuy had voluntarily recalled the "PS Tibial Insert" of the LCS–P/S Knee.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it may affect the outcome of the suit under the applicable law. *Id.* In deciding whether there is a disputed issue of material fact, a court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. 2505.

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demon-strate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. The non-moving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material of fact. Fed.R.Civ.P. 56(e).

## III. *MOTION TO STRIKE*

As a threshold matter, the Court must determine whether to strike, or in the alternative disregard, the affidavits of Dr. Charles H. Kyper pursuant to Fed.R.Evid. 702 and Fed.R.Civ.P. 56(e).

In opposition to DePuy's motion for summary judgment, Plaintiffs submit affidavits [6] by Dr. Charles H. Kyper, currently the principal consultant at Kyper & Associates, a medical device consulting firm, and formerly an employee with the FDA in different capacities from 1966 to 1994. Plaintiffs contend that Dr. Kyper's affidavits are offered "to demonstrate, with facts, the vast difference between a full PMA review (original LCS–Knee) ... and the cursory and perfunctory Real–Time review" of the LCS–P/S Knee. Plaintiffs also argue that Dr. Kyper's affidavits establish that the "FDA's Real–Time review of the LCS–P/S Knee was equivalent, in terms of length and thoroughness, to the § 510(k) process which was found by the majority of the Supreme Court in [*Med-*

---

**6.** Dr. Kyper submitted an original affidavit in support of Plaintiffs' opposition to DePuy's motion for summary judgment, and a supple-mental affidavit following DePuy's motion to strike.

tronic, Inc. v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)] to have no preemptive effect." DePuy counters that Dr. Kyper's "interpretation and application" of "selected FDA regulations" to the facts of this case "is a matter of law solely within the province of this Court and not within the proper scope of expert opinion" pursuant to Fed.R.Evid. 702. DePuy further argues that because Dr. Kyper lacks personal knowledge regarding the FDA's Real–Time review of the PMA supplement for the LCS–P/S Knee, the Court should strike his affidavits pursuant to Fed. R.Civ.P. 56(e).

■ In deciding a motion for summary judgment, the Court may consider evidence that would be admissible at trial. Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." See also Local Civ. R. 7.2(a) (stating that "[a]ffidavits shall be restricted to statements of fact within the personal knowledge of the affiant," and "[a]rgument of the facts and the law shall not be contained in affidavits").

■ The parties do not dispute that the FDA approved DePuy's PMA supplement for the LCS–P/S Knee. Rather, they disagree on whether that approval imposes specific federal requirements on the LCS–P/S Knee for purposes of triggering preemption under Section 360k(a) of the MDA. However, whether the FDA's approval of a PMA supplement imposes requirements on a particular device is a question of law to be determined by the Court, not a question of fact for the jury. Consequently, Dr. Kyper's opinion regarding the nature and scope of the FDA's Real–Time review of the LCS–P/S Knee would neither assist the trier of fact to understand evidence, nor help the jury to

determine a fact in issue. See Fed.R.Evid. 702 (providing that expert opinion is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue").

Further, Dr. Kyper's assessment of the FDA's approval of DePuy's PMA supplement lacks the requisite personal knowledge required by Fed.R.Civ.P. 56(e) and Local Civ. R. 7.2(a). Although Dr. Kyper attests that the information provided in his affidavits is based on personal knowledge, his affidavits do not indicate that he participated in the FDA's approval of the LCS–P/S Knee. Dr. Kyper's affidavits reveal that he merely reviewed correspondence between the FDA and DePuy and other related FDA materials, and based on that information only, concluded that certain deficiencies and misrepresentations made by DePuy existed in the FDA's review of the device. Dr. Kyper fails to present any evidence that he participated in the FDA's review of the LCS–P/S Knee. Moreover, his affidavits fail to indicate that he contacted the FDA to confirm the truth and accuracy of the information contained in the FDA's correspondence with DePuy. Finally, Dr. Kyper's original affidavit is replete with recitations and legal interpretations of FDA regulations regarding medical devices. Thus, because Dr. Kyper's affidavits contain unsubstantiated conclusory statements regarding the adequacy and extent of the FDA's review of DePuy's PMA supplement for the LCS–P/S Knee, coupled with rote recitations and legal interpretations of FDA regulations, the Court declines to consider them in deciding the instant motion. DePuy's motion to strike is granted.

## IV. PREEMPTION

■ The Supremacy Clause of the United States Constitution provides that the "Laws of the United States ... shall be the supreme Law of the Land." U.S.

Const. art. VI, cl. 2. Accordingly, any "state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citation omitted). Federal law may preempt, and thereby displace, state law in one of three ways: (1) " 'express preemption,' which arises when there is an explicit statutory command that state law be displaced; (2) 'field preemption,' which arises when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it; and (3) 'conflict preemption,' which arises when a state law makes it impossible to comply with both state and federal law or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *St. Thomas—St. John Hotel & Tourism Ass'n, Inc. v. Government of the United States Virgin Islands*, 218 F.3d 232, 238 (3d Cir.2000) (internal quotations and citations omitted).

DePuy moves for summary judgment, arguing that Plaintiffs' state-law claims are expressly preempted by the MDA because those claims would impose requirements different from, or in addition to, the specific federal requirements imposed on the LCS–P/S Knee by FDA regulations.[7] The MDA contains the following preemption provision:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>> (2) which relates to the safety or effectiveness of the device or to any

other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The FDA regulations interpreting Section 360k(a) provide in part:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted ... because they are not "requirements applicable to a device" within the meaning of section [360k(a)] of the act. The following are examples of State and local requirements that are not regarded as preempted....
>
> (1) Section [360k(a)] does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (*e.g.*, requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.
>
> (2) Section [360k(a)] does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

21 C.F.R. § 808.1(d). Although at first glance the language of Section 360k(a)

---

**7.** In a footnote in its reply brief, DePuy argues that Plaintiffs' claims also are barred by "conflict preemption." However, the remainder of DePuy's moving papers focus on express preemption. Based on DePuy's terse treatment of conflict preemption, the Court declines to consider that argument for purposes of the instant motion.

might seem fairly straightforward, that section has spawned a legion of cases attempting to determine its preemptive scope.

### A. Medtronic v. Lohr

In *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the plaintiffs brought suit against the manufacturer of a Class III pacemaker device that had been approved as a device "substantially equivalent" to a pre-existing device, asserting state-law claims of negligence and strict liability. In a five-to-four decision, the Court held that the plaintiffs' claims were not preempted by the MDA.

Based on the statutory language and the FDA's regulations interpreting the scope of Section 360k(a), the Court established certain guideposts for determining whether state-law claims are preempted by the MDA. The *Lohr* majority[8] stated that state requirements must be "with respect to" medical devices, "different from, or in addition to," federal requirements, and must relate "to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device." *Id.* at 500, 116 S.Ct. 2240. In addition, state requirements of "general applicability" are not preempted except where they have "the effect of establishing a substantive requirement for a specific device." *Id.* Federal requirements must be "applicable to the device," and preempt state law only if the FDA has established "specific counterpart regulations" or other "specific" regulations applicable to a particular device. *Id.* Once a court identifies the relevant federal and state requirements, it must conduct "a careful comparison" between those requirements "to determine whether they fall within the intended pre-emptive scope of the statute and regulations." *Id.*

Applying those principles, the *Lohr* Court unanimously concluded that the plaintiffs' negligent design claims were not preempted because the Section 510(k) premarket notification process did not impose federal requirements on the design of the pacemaker. *Id.* at 492–94, 116 S.Ct. 2240; *Id.* at 513, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part). The Court explained that FDA approval under that process did not "require" the pacemaker to take "any particular form for any particular reason," and therefore "the agency simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the PMA process." *Id.* at 493–94, 116 S.Ct. 2240. Next, the Court unanimously concluded that "[n]othing in § 360k denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at 495, 116 S.Ct. 2240; *Id.* at 513, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part).

The Court sharply divided, however, on whether the plaintiffs' state-law manufacturing and labeling claims were preempted by the MDA. With respect to the nature of the federal requirement, the majority found that the federal manufacturing and labeling requirements applicable to all medical devices reflected "important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at 501, 116 S.Ct. 2240. Accordingly, the Court explained that the "generality of those requirements make this quite unlike a case in which the Federal Government has weighed the competing interests rele-

---

8. Justice Breyer joined this section (Part V) of the Court's opinion.

vant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Id.*

Similarly, with respect to the nature of the state requirement, the Court concluded that the plaintiffs' general state common-law claims were not "specifically developed" "with respect to" the pacemaker, and thus "escape[d] pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices such as pacemakers." *Id.* at 501–02, 116 S.Ct. 2240.

Justice O'Connor, writing on behalf of the Chief Justice, Justice Scalia, and Justice Thomas, primarily disagreed with the plurality's conclusion that the plaintiffs' claim survived preemption "insofar as they would compel [the manufacturer] to comply with requirements different from those imposed by the FDCA." *Lohr,* 518 U.S. at 513, 116 S.Ct. 2240 (O'Connor, concurring in part and dissenting in part). Justice O'Connor stated that the plaintiffs' "claims regarding manufacture would, if successful, impose state requirements 'different from, or in addition to,' the FDA's 'extensive federal manufacturing and labeling requirements[.]' " *Id.* at 514, 116 S.Ct. 2240.

Justice Breyer, concurring in part and concurring in the judgment, agreed with Justice O'Connor's conclusion that state common-law damages actions impose requirements on a particular device, and are therefore preempted where such requirements would differ from those imposed by the FDCA. *Lohr,* 518 U.S. at 504, 116 S.Ct. 2240. However, Justice Breyer agreed with the plurality that the FDA's manufacturing and labeling requirements imposed on the pacemaker, "even if numerous," were not " 'specific' in any relevant sense," and therefore did not preempt state-law claims of general applicability. *Id.* at 507, 116 S.Ct. 2240 (Breyer, J., concurring in part and concurring in the judgment). Finding that "no actual conflict" existed "between any federal requirement and any of the liability-creating premises of the plaintiffs' state-law suit," Justice Breyer concurred with the Court's judgment that the plaintiff's state-law claims were not preempted by the MDA. *Id.* at 507–08, 116 S.Ct. 2240.

**B. Post–*Lohr* & whether PMA and PMA supplement review imposes federal requirements on the LCS–P/S Knee.**

Based on the tenets articulated by the *Lohr* Court, this Court must first determine whether FDA approval of DePuy's PMA supplement imposes specific federal requirements on the LCS–P/S Knee.[9] This

---

**9.** The Court rejects Plaintiffs' contention that the FDA's approval of a PMA supplement is akin to the agency's approval of a device "substantially equivalent" to a device that already exists on the market. Unlike the device at issue in *Lohr,* which the FDA had approved pursuant to Section 510(k), the FDA approved the LCS–Knee, and its successor the LCS–P/S Knee, through the more rigorous and comprehensive PMA and PMA supplement review processes, and specifically determined that those devices were both safe and effective for

commercial use; the FDA does not make such a determination as part of its premarket notification approval process. *Lohr,* 518 U.S. at 478–79, 116 S.Ct. 2240 (stating that "[t]he 510(k) notification process is by no means comparable to the PMA process"); *see Webster v. Pacesetter Inc.,* 171 F.Supp.2d 1, 11 (D.D.C.2001) (stating that "[e]very court that has considered MDA preemption has noted the significant difference in the degree of scrutiny between Section 510(k) notice review and the PMA process.") Moreover, DePuy's

is a close question. First, although the Court in *Lohr* attempted to articulate general guideposts for determining the preemptive scope of Section 360k, it did not address a central issue in this case: whether PMA and/or PMA supplement approval of a Class III medical device by the FDA imposes requirements on a particular device within the meaning of the MDA and the FDA's regulations interpreting the scope of Section 360k(a).

In the wake of *Lohr*, courts have divided sharply on this issue. A majority of federal circuit courts and state courts of last resort have held that the PMA process imposes specific federal requirements on a medical device so as to trigger preemption of state-law claims. *See, e.g., Brooks v. Howmedica, Inc.*, 273 F.3d 785, 795–96 (8th Cir.2001) (en banc), *cert. denied*, 535 U.S. 1056, 122 S.Ct. 1914, 152 L.Ed.2d 823 (2002); *Martin v. Medtronic, Inc.*, 254 F.3d 573, 584 (5th Cir.2001), *cert. denied*, 534 U.S. 1078, 122 S.Ct. 807, 151 L.Ed.2d 693 (2002); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 226–27 (6th Cir.2000), *cert. denied*, 534 U.S. 818, 122 S.Ct. 48, 151 L.Ed.2d 19 (2001); *Mitchell v. Collagen Corp.*, 126 F.3d 902, 911 (7th Cir.1997), *cert. denied*, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 467 (1998); *see also Horn v. Thermo Cardiosystems, Inc.*, 229 F.Supp.2d 381, 390 (M.D.Pa.2002); *Enlow v. St. Jude Med., Inc.*, 210 F.Supp.2d 853, 858–62 (W.D.Ky.2001); *In re Medtronic Polyurethane Insulated Pacing Lead Prod. Liab. Lit.*, 96 F.Supp.2d 568, 570

(E.D.Tex.1999); *Easterling v. Cardiac Pacemakers, Inc.*, 986 F.Supp. 366, 373–75 (E.D.La.1997); *Richman v. W.L. Gore & Assocs.*, 988 F.Supp. 753, 758 (S.D.N.Y. 1997); *Milkiewicz v. Baxter Healthcare Corp.*, 963 F.Supp. 1150, 1156 (M.D.Fl. 1996); *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 376 (Tex.), *cert. denied*, 524 U.S. 954, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998); *Fry v. Allergan Med. Optics*, 695 A.2d 511, 516 (R.I.), *cert. denied*, 522 U.S. 952, 118 S.Ct. 374, 139 L.Ed.2d 291 (1997); *Green v. Dolsky*, 546 Pa. 400, 685 A.2d 110, 117–18 (1996), *cert. denied*, 520 U.S. 1168, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997). On the other hand, a minority of courts have found that the PMA review process is not device-specific, and therefore does not preempt state-law claims. *See, e.g., Goodlin v. Medtronic, Inc.*, 167 F.3d 1367, 1375–80 (11th Cir.1999); *Woods v. Gliatech Inc.*, 218 F.Supp.2d 802, 808 (W.D.Va. 2002); *Webster v. Pacesetter Inc.*, 171 F.Supp.2d 1, 10–12 (D.D.C.2001); *Haidak v. Collagen Corp.*, 67 F.Supp.2d 21, 28–29 (D.Mass.1999); *Lakie v. SmithKline Beecham*, 965 F.Supp. 49, 53–54 (D.D.C.1997); *Weiland v. Telectronics Pacing Sys., Inc.*, 188 Ill.2d 415, 242 Ill.Dec. 618, 721 N.E.2d 1149, 1152 (1999);.

Prior to *Lohr*, the Third Circuit Court of Appeals had found that PMA approval of a Class III medical device imposes specific requirements on a particular device sufficient to preempt state-law claims. *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1324 (3d Cir.), *cert. denied*, 516 U.S. 815, 116 S.Ct.

---

PMA supplement for the LCS–P/S Knee's "tibial" component supplemented, rather than supplanted, the PMA requirements for its predecessor, the LCS–Knee. As one court of appeals has explained, "a PMA Supplement proposes changes to a device that has already received rigorous review and approval during the original PMA process." *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 227 (6th Cir.2000), *cert. denied*, 534 U.S. 818, 122 S.Ct. 48, 151 L.Ed.2d 19 (2001). Hence, because "the

PMA Supplement process builds upon the rigorous PMA process," the FDA evaluates "the proposed modifications presented in the PMA Supplement while relying on its earlier approval of the original device." *Id.* In determining whether FDA regulations impose specific requirements applicable to the LCS–P/S Knee, this Court considers the FDA's approval of the PMA for the LCS–Knee as well as its approval of the PMA supplement for the LCS–P/S Knee.

67, 133 L.Ed.2d 29 (1995). There, the recipient of a defective heart valve brought suit against the manufacturer of that device for negligent design, strict liability, breach of express and implied warranty, fraud-on-the-FDA, and common-law fraud by the manufacturer. *Id.* at 1321. The heart valve had received PMA approval. However, the Court of Appeals noted that because the device "was one of the first medical devices to be approved" under the MDA, the manufacturer's PMA application did not receive "the same organized and comprehensive evaluation that might be expected today." *Id.* at 1320. In determining whether the FDA had imposed requirements on the heart valve, the court found that although the FDA's "generally applicable" labeling and manufacturing regulations did not "rise to the level of specificity present in the case of some other devices regulated by the FDA," those regulations nonetheless presented " 'specific requirements applicable to a particular device under the act.' " *Id.* at 1324. Although the majority in *Lohr* rejected *Shiley's* conclusion that the FDA's "generally applicable" labeling and manufacturing regulations found in 21 C.F.R. §§ 801.1–801.16 and §§ 21 C.F.R. 820.1–820.198 present specific requirements applicable to a particular device, *Lohr* did not address whether PMA and/or PMA supplement approval imposes requirements on the device sufficient to trigger preemption under Section 360k(a). Complicating the matter further, since *Lohr* the Third Circuit has not addressed this question.

Not surprisingly, DePuy argues that *Shiley,* as well as a majority of pre- and post-*Lohr* decisions in other jurisdictions instruct that PMA and PMA supplement approval impose requirements on a Class III medical device such as the LCS–P/S

Knee. Plaintiffs counter that *Lohr,* as well as post-*Lohr* Third Circuit decisions suggest that their claims are not preempted by the MDA. Specifically, Plaintiffs contend that *Hawkins v. Leslie's Pool Mart, Inc.,* 184 F.3d 244 (3d Cir.1999); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781 (3d Cir.1999) (*Bone Screw II*); and *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 159 F.3d 817 (3d Cir.1998) (*Bone Screw I*), rev'd, *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), are both dispositive of the instant motion, and are "directly in opposition to the legal theory DePuy advances for express preemption." [10] This Court finds Plaintiffs' arguments unpersuasive.

First, *Bone Screw I* and *Bone Screw II* are inapposite to the instant case because those cases dealt with medical devices approved as devices "substantially equivalent" to pre-existing devices, not the PMA and PMA supplement processes at issue. Second, *Hawkins* also is distinguishable. That case addressed whether a plaintiff's failure-to-warn claim against the manufacturer of chlorinator tablets was preempted under an express provision of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq. Hawkins,* 184 F.3d at 246. Because the statutory language and regulatory scheme of the FIFRA differs from that of the FDCA, *Hawkins* does not control the disposition of the instant motion.

■ Based on the Third Circuit's decision in *Shiley,* which found that the PMA process imposes requirements on a Class III medical device, and the reasoning expressed by a majority of courts in other jurisdictions following *Lohr,* which support that view, *see, e.g., Martin,* 254 F.3d at

---

**10.** Plaintiffs suggest that DePuy failed to cite *Bone Screw I, Bone Screw II,* and *Hawkins,* despite its obligation to do so under Fed.

R.Civ.P. 11. This Court declines to entertain Plaintiffs' invitation to impose Rule 11 sanctions.

584, *Kemp*, 231 F.3d at 226–27, *Mitchell*, 126 F.3d at 911, this Court finds that FDA approval of the PMA supplement for the LCS–P/S Knee imposes specific federal requirements applicable to that device sufficient to trigger preemption under Section 360k(a). The Seventh Circuit, for example, has observed that PMA of a product's design, testing, intended use, manufacturing methods, performance standards and labeling, is "specific to the product," and therefore preempts state-law claims that would impose requirements "different from, or in addition to" the agency's determination on those matters. *Mitchell*, 126 F.3d at 913. Similarly, the Fifth Circuit has held that the PMA process imposes specific requirements as to the labeling, manufacturing, and design of a Class III medical device. *Martin*, 254 F.3d at 581, 583–84 (reaffirming its pre-*Lohr* decision in *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1422 (5th Cir.), *cert. denied*, 510 U.S. 824, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993)); *see also Kemp*, 231 F.3d at 226–28 (finding PMA and PMA supplement approval of Class III pacemaker constitute specific requirement invoking preemption under § 360k).

Recently, in *Horn v. Thermo Cardiosystems, Inc.*, 229 F.Supp.2d 381 (M.D.Pa. 2002), the recipient of a Class III heart pump brought suit against the manufacturer of that device for negligence, strict liability, and breach of implied warranties of merchantability and fitness for a particular purpose. *Id.* at 384–85. Relying on an "overwhelming weight of authority," *id.* at 383, and citing evidence of extensive and continuous review of the device by the FDA, *id.* at 386–88, the *Horn* court concluded that "the PMA process is a specific federal requirement applicable to" the device. *Id.* at 390. The court also noted that its decision was "consistent with pre-*Lohr* Third Circuit law, which decrees that the PMA is a federal requirement that triggers MDA preemption." *Id.* (citing *Shiley*, 46 F.3d at 1324).

Here, DePuy has demonstrated that the FDA rigorously and continually regulated the labeling, marketing, and design of the LCS–Knee and its successor, the LCS–P/S Knee. Although the requirements imposed by the PMA and PMA supplement processes are applicable to many Class III devices, the absence of regulations that relate specifically, or refer directly, to the LCS–P/S Knee does not preclude a finding that the FDA has imposed requirements applicable to the subject device. Unlike the "entirely generic" federal labeling and manufacturing applicable to all medical devices, *see Lohr*, 518 U.S. at 493, 501, 116 S.Ct. 2240, PMA and PMA supplement approval require a manufacturer to demonstrate with particularity that the device is both safe and effective for its intended use. Indeed, prior to the FDA's approval of DePuy's PMA supplement for the LCS–P/S Knee, the agency reviewed and evaluated the specific design, manufacturing, and labeling of that device, *see* 21 U.S.C. §§ 360e(c), 360e(d)(2), and specifically determined that the device was both safe and effective "with respect to the persons for whose use the device is represented or intended, with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device," and after "weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." 21 U.S.C. § 360c(a)(2). Moreover, the FDA continually monitored and imposed restrictions on the design, labeling, and marketing of the LCS–P/S Knee. *See* 21 C.F.R. § 814.39; *see also* 21 C.F.R. § 803.1 (requiring manufacturer to report "deaths and serious injuries" related to the operation of the device, to "maintain adverse event files," and to submit to FDA "specified followup and summary reports"). Following FDA approval of the

LCS–P/S Knee, DePuy could not change the design, manufacturing, labeling, packaging, or quality control methods without further FDA approval. The Court finds that the FDA's approval of DePuy's PMA supplement for the LCS–P/S Knee evinces a situation where "the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Lohr,* 518 U.S. at 501, 116 S.Ct. 2240. Accordingly, consistent with pre-*Lohr* Third Circuit case law and a majority of post-*Lohr* courts in other jurisdictions, the Court finds that the FDA's approval of the PMA supplement for the LCS–P/S Knee imposes specific requirements on that device sufficient to trigger preemption under Section 360k(a).

Having determined that PMA supplement approval imposes requirements on the subject device, the Court must determine whether Plaintiffs' state-law claims impose requirements different from, or in addition to, those requirements.[11]

### 1. *Negligence, Strict Liability, and Breach of Implied Warranty*

■ Plaintiffs assert that DePuy defectively designed and manufactured the tibial insert components of the LCS–P/S Knee, and failed to provide users and medical providers with adequate warning regarding the defective, inherently dangerous, and unsafe condition of that device. DePuy argues that Plaintiffs' negligence, strict liability, and breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose claims, if successful, would impose requirements different from, or in addition to, the requirements imposed by the FDA through PMA and PMA supplement approval of the LCS–P/S Knee, and, therefore, are preempted by the MDA. This Court agrees.

The Third Circuit has held that state-law claims of negligent manufacture and design, strict liability, and breach of implied warranty may impose requirements different from, or in addition to, federal requirements imposed on a particular device by the FDA. *Shiley,* 46 F.3d at 1323, 1324; *Gile v. Optical Radiation Corp.,* 22 F.3d 540, 541–42, 543–44 (3d Cir.), *cert. denied,* 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994). Specifically, the Third Circuit in *Shiley* held that because of the potential conflict between state-law negligence, strict liability, and breach of implied warranty claims with FDA labeling, design, and manufacturing requirements, those claims are preempted by the MDA. *Shiley,* 46 F.3d at 1324 (relying on *Gile,* 22 F.3d at 543–44). Critical to the disposition of this motion, then, is whether, and to what extent, if any, *Lohr* overruled *Shiley* and *Gile* on this issue.

A plurality in *Lohr* found that "few, if any, common-law duties have been preempted by [the] statute." *Lohr,* 518 U.S. at 502–03, 116 S.Ct. 2240. However, the plurality stopped short of concluding that "common-law duties are *never* requirements within the meaning of 360k and that the statute therefore never preempts common-law actions." *Id.* at 502, 116 S.Ct. 2240 (emphasis added). The majority also agreed that state-law requirements of "general applicability" are not preempted except where they have the

---

**11.** Because Plaintiffs do not allege that DePuy failed to comply with FDA regulations, the Court addresses only those claims predicated on DePuy's failure to comply with general state common-law duties, strict product liability, breach of express and implied warranties, and common-law fraudulent concealment by the manufacturer.

"effect of establishing a substantive requirement for a specific device." *Id.* at 500, 116 S.Ct. 2240. Five Justices disagreed with the plurality's conclusion that the MDA would "rarely" preempt state common-law actions. *Id.* at 504, 116 S.Ct. 2240 (Breyer, J., concurring in part); *Id.* at 510, 511, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part). Justice O'Connor stated that "state common-law damages actions do impose 'requirements' and are therefore preempted where such requirements would differ from those imposed by the FDCA." *Id.* at 510, 511, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part)(stating that "[w]hether relating to the labeling of cigarettes or the manufacture of medical devices, state common-law damages actions operate to require manufacturers to comply with common-law duties"). Agreeing with Justice O'Connor on that point, Justice Breyer stated that "a contrary holding would have anomalous consequences." *Id.* at 504, 116 S.Ct. 2240 (Breyer, J., concurring in part). To illustrate that proposition, Justice Breyer offered the following hypothetical:

> Imagine that, in respect to a particular hearing aid component, a federal MDA regulation requires a 2–inch wire, but a state agency regulation requires a 1–inch wire. If the federal law, embodied in the "2–inch" wire MDA regulation, pre-empts the state "1–inch" agency regulation, why would it not similarly pre-empt a state-law tort action that premises liability upon the defendant manufacturer's failure to use a 1–inch wire (say, an award by a jury persuaded by expert testimony that use of a more than 1–inch wire is negligent)? The effects of the state agency regulation and the state tort suit are identical.

*Id.* Thus, based on Justice Breyer's concurrence, five justices agreed that state-law damage actions can constitute requirements sufficient to trigger preemption by the MDA. *Lohr,* 518 U.S. at 509, 116 S.Ct. 2240 (O'Connor, J., dissenting); *Id.* at 503, 116 S.Ct. 2240 (Breyer, J., concurring in part). Given the Court's fractured decision on whether state-law duties of general applicability can impose requirements for purposes of preemption, and the fact that the majority agreed that state-law requirements of "general applicability" are not preempted except where they have the "effect of establishing a substantive requirement for a specific device," this Court does not believe that *Lohr* explicitly or implicitly overrules *Shiley* and *Gile.* Accordingly, state-law claims of general applicability may be preempted where they have the effect of establishing a substantive requirement for a specific device.

Plaintiffs' claims are predicated on DePuy's alleged inadequate design, manufacturing, and labeling of the LCS–P/S Knee. Although those claims are based on general duties not specifically developed "with respect to" the LCS–P/S Knee, to succeed on those claims, the jury would have to conclude that the LCS–P/S Knee contained inadequate labeling, or was unreasonably dangerous or defective, despite the FDA's determination on those matters. *See, e.g., Shiley,* 46 F.3d at 1324–25 (stating that jury's finding that manufacturer breached implied warranties was preempted because accepted standards for design and manufacture of products under state law may deviate from FDA's determinations in PMA process); *Horn,* 229 F.Supp.2d at 390 (finding that "any judgment that the [Class III PMA-approved medical device] was unsafe or otherwise substandard would be in direct conflict— *i.e.,* different from—the FDA's determination that the product was suitable for use"). For example, Plaintiffs contend that the LCS–P/S Knee was unsafe for its intended purpose and unreasonably dangerous to users. If successful, those claims would require a jury to conclude

that the FDA's determination of the safety and efficacy of the device was insufficient, thereby imposing requirements different from, or in addition to, the FDA's determination on those matters. Such a ruling would have "the effect of establishing a substantive requirement" for the LCS–P/S Knee, and therefore is preempted. *See Lohr,* 518 U.S. at 500, 116 S.Ct. 2240; *see, e.g., Mitchell,* 126 F.3d at 915 (finding that "state judgment for breach of implied warranty that rested on allegations about standards other than those permitted by the FDA would necessarily interfere with the PMA process and, indeed, supplant it"). The Court finds that Plaintiffs' negligence, strict liability, and breach of implied warranty claims impose safety and effectiveness requirements on the LCS–P/S Knee that, if successful, would differ from, or impose additional requirements to, those requirements established by the FDA on that device, and are, therefore, preempted by the MDA. Accordingly, DePuy's motion for summary judgment is granted with respect to Plaintiffs' negligence, strict liability, and breach of implied warranty claims.

### 2. *Breach of Express Warranty*

■ DePuy argues that Plaintiffs' breach of express warranty claim is preempted under Section 360k(a). Relying on *Shiley,* 46 F.3d at 1325–27, Plaintiffs assert that their breach of express warranty claim is not preempted by the MDA.

In *Shiley,* the plaintiff brought a claim for breach of an express warranty based on statements made by the manufacturer on its packaging and labeling of the device. *Id.* at 1325. The court found that because express warranties "arise from representations of the parties," and therefore "do not result from the independent operation of state law," the MDA does not preempt state-law claims of breach of express warranty. *Id.; accord Mitchell,* 126 F.3d at

915. In other words, because a breach of express warranty claim "is not a product of state action," and hence, "not state imposed—the *sine qua non* of pre-emption under § 360k," that claim is not preempted by the MDA. *Id.* at 1328; *see also Cipollone,* 505 U.S. at 526, 112 S.Ct. 2608 (noting that " 'requirements' imposed by an express warranty claim are not 'imposed under State law,' but rather imposed *by the warrantor* ").

The court in *Shiley* also rejected the manufacturer's argument that because the labels on its product were approved by the FDA, any contract claims based on the representations made on those labels conflicted with the FDA's supervision over medical device labeling. 46 F.3d at 1327–28; *but see Enlow v. St. Jude Med., Inc.,* 210 F.Supp.2d 853, 861–62 (W.D.Ky.2001) (finding Third Circuit's reasoning in *Shiley* "unpersuasive," and holding express warranty claim preempted by the MDA). First, the court noted that "[t]he fact that third parties dictate or define the terms of a contract does not undermine the doctrine that contractual duties arise from the mutual assent of parties to agreed upon language." *Shiley,* 46 F.3d at 1327. Second, the court found significant the manufacturer's "active" and "meaningful" participation in the development and design of the FDA-approved labeling. *Id.* at 1328. Finally, the court found that Section 360k did not preempt the plaintiff's express warranty claim to the extent that the claim sought to enforce the same requirements as imposed by the FDA. *Id.* In that regard, the court explained that "[b]ecause the obligations imposed arise from the FDA's own approved language, the resulting liability does not differ from or add to FDA regulation." *Id.*

Similar to the plaintiff in *Shiley,* Plaintiffs here argue that DePuy breached express warranties because the LCS–P/S

Knee did not "conform to the representation defendant made in its promotional and advertising material[s][.]" [12] To the extent that Plaintiffs' breach of express warranty claim is predicated on DePuy's failure to adhere to FDA-approved packaging, labeling or advertising materials regarding the LCS–P/S Knee, *Shiley* instructs that those claims are not preempted under Section 360k(a). 46 F.3d at 1327–28. Furthermore, any express warranty claims that are based on representations made by DePuy concerning non-FDA approved promotional and advertising materials also are not preempted by the MDA because those claims arise out of a private contractual agreement rather than "a product of state action." *Id.* at 1328. Accordingly, DePuy's motion for summary judgment is denied with respect to Plaintiffs' breach of express warranty claims.[13]

### 3. *Fraudulent Concealment*

■ New Jersey recognizes the common-law tort of fraudulent concealment. *Rosenblit v. Zimmerman*, 166 N.J. 391, 766 A.2d 749, 757–58 (2001); *Viviano v. CBS, Inc.*, 251 N.J.Super. 113, 123, 597 A.2d 543 (App.Div.1991), *cert. denied*, 127 N.J. 565, 606 A.2d 375 (1992). To succeed on that claim, a plaintiff must prove that: (1) the defendant had a duty to disclose information to the plaintiff; (2) the information was material; (3) the plaintiff could not readily have learned of the information without the defendant disclosing it; (4) the defendant intentionally withheld, altered, or destroyed the information; and (5) the plaintiff suffered harm by relying on the non-disclosure. *Rosenblit*, 766 A.2d at 758; *Viviano*, 251 N.J.Super. at 123, 597 A.2d 543.

■ DePuy argues that Plaintiffs' fraudulent concealment claim is preempted. Again, the Third Circuit's decision in *Shiley*, 46 F.3d at 1329–31, is instructive. There, the plaintiff alleged that the manufacturer of a defective heart valve had "sent cardiac surgeons and cardiologists a series of letters and other promotional materials which knowingly misrepresented the extent of the valve fracture problem and knowingly overstated the reduction in serious side effects achieved" by the heart valve. *Id.* at 1329. The court found that the plaintiff's "fraudulent promotion" claim was not preempted for two primary reasons. *Id.* at 1330–31. First, the court noted that unlike a strict liability claim, which is predicated on the duty to produce a safe product, a fraud claim is based " 'on a more general obligation—the duty not to deceive,' " *id.* at 1330 (quoting *Cipollone*, 505 U.S. at 528–29, 112 S.Ct. 2608), and therefore does not "relate to the safety or effectiveness" of a particular device. Second, the court noted that the FDA had neither imposed specific requirements on the advertising or promotional materials for the device nor regulated or supervised the manufacturer's efforts to promote the device. Based on those circumstances, the

---

**12.** Under New Jersey law, a seller creates an express warranty as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J. Stat. Ann. 12A:2–313(1).

**13.** At this juncture, because DePuy moved for summary judgment solely on the ground of preemption of Plaintiffs' state-law claims, the Court does not make a determination regarding the sufficiency of the evidence on Plaintiffs' breach of express warranty claim.

court held that the plaintiff's fraud claim was not preempted.

Plaintiffs allege that DePuy "concealed information regarding the lack of safety and/or defective condition" of the LCS–P/S Knee from the recipients of that device and their medical providers.[14] Under *Shiley's* and *Lohr's* preemption framework, the Court must determine whether the FDA required DePuy to disclose information regarding the safety and effectiveness of the subject knee prosthesis. Because DePuy fails to identify whether the FDA has imposed requirements on DePuy regarding its obligation to disclose certain information to patients and other relevant parties, the Court cannot determine whether Plaintiffs' fraudulent concealment claim is preempted by the MDA. Accordingly, DePuy's motion for summary judgment is denied on Plaintiffs' fraudulent concealment claim.

## V. CONCLUSION

DePuy's motion for summary judgment is (1) granted with respect to Plaintiffs' state-law claims of negligent manufacturing, design, warning and labeling, strict product liability, and breach of implied warranty of merchantability and fitness for a particular purpose, and (2) denied with respect to Plaintiffs' state-law claims of breach of express warranty and fraudulent concealment. The Court also grants DePuy's motion to strike Dr. Charles H. Kyper's affidavits.

---

**14.** A fair reading of the complaint reveals that Plaintiffs do not assert a "fraud-on-the FDA" claim. *See Buckman,* 531 U.S. at 348, 121 S.Ct. 1012 (holding that state-law "fraud-on-the-FDA" claims are impliedly preempted under the FDCA). In addition, although Plaintiffs aver to certain facts in their opposition brief that might give rise to a common-law fraud claim, those facts are absent from the complaint. *See* Fed.R.Civ.P. 9(b) (requiring that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). From the face of the complaint, this Court gleans only a claim of fraudulent concealment against DePuy.